IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEWEY WHITMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-190-SLR |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| | ) | |
| Defendant. | ) | |

---

John S. Grady, Esquire, Grady & Hampton, Dover, Delaware.
Counsel for Plaintiff.

David F. Chermol, Esquire, Office of Regional Counsel, Social
Security Administration, Philadelphia, Pennsylvania.  Counsel for
Defendant.

---

**MEMORANDUM OPINION**

Dated:  January  9 , 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

Presently before the court is a complaint filed by Dewey
Whitmore ("plaintiff") on March 21, 2005 (D.I. 2), seeking review
of the final decision of defendant Jo Anne B. Barnhart,
Commissioner of the Social Security Administration, denying
plaintiff's application for supplemental security income ("SSI")
under Title XVI of the Social Security Act, 42 U.S.C. §§
1381-1383(f). Plaintiff has filed a motion for summary judgment
asking the court to reverse defendant's decision and award him
benefits. (D.I. 12) Defendant has likewise filed a motion for
summary judgment and requests that the court affirm her decision.
(D.I. 15) The court has jurisdiction over this matter pursuant
to 42 U.S.C. §§ 405(g), 1383(c).[1]

---

[1]Under § 405(g),

> [a]ny individual, after any final decision of the
> Commissioner of Social Security made after a hearing to
> which he was a party . . . may obtain a review of such
> decision by a civil action commenced within sixty days
> after the mailing to him of notice of such decision . .
> . . Such action shall be brought in the district court
> of the United States for the judicial district in which
> the plaintiff resides . . . .

42 U.S.C. § 405(g). Likewise, § 1383(c) states that "[t]he final
determination of the Commissioner of Social Security after a
hearing . . . shall be subject to judicial review as provided in
section 405(g) of this title to the same extent as the
Commissioner's final determinations under section 405 of this
title." Id. § 1383(c)(3).

## II.  BACKGROUND

### A.  Procedural Background

Plaintiff filed his first application for SSI in July 2002, alleging an onset date of May 1, 2002.  (D.I. 10 at 78, 90)  His request was denied on September 17, 2002.  According to the Administrative Law Judge ("ALJ") who later held a hearing on plaintiff's second SSI claim, "there is no record of any further administrative appeal on [the July 2002] claim."  (Id. at 12) Plaintiff filed a second application for SSI on May 21, 2003, claiming that, as of June 23, 2002, he had been unable to work because of "[s]eizure/cluster headaches/vertigo, chronic headaches, carpel [sic] tunnel, depression, chronic sinusitis, tintinitis, chronic pressure [and] pain in [his] left temple." (Id. at 82, 104, 107)

Plaintiff's application was denied both initially and upon reconsideration.  (Id. at 12)  He made a timely request for a hearing before an ALJ, which was held on October 20, 2004.  (Id.) Both plaintiff and an independent vocational expert testified at the Administrative Law Hearing (the "Hearing").  (Id.)  On October 28, 2004, the ALJ found that, "based on the application filed on May 21, 2003, [plaintiff] is not eligible for Supplemental Security Income payments under [§ 1381a[2]] and [§

_____

[2]"Every . . . disabled individual who is determined . . . to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this subchapter,

2

1382c(a)(3)(A)[3]] of the Social Security Act."   (Id. at 20)   The

ALJ made the following findings:

1.   [Plaintiff] has not engaged in substantial gainful
     activity since the alleged onset of disability.
2.   [Plaintiff's] left carpal tunnel syndrome, seizure
     disorder, chronic sinusitis with headaches and
     history of alcohol abuse in remission are
     considered "severe" based on the requirements in
     the [Code of Federal Regulations[4]] (20 CFR §
     416.920(b)).
3.   These medically determinable impairments do not
     meet or medically equal any of the listed
     impairments in Appendix 1, Subpart P, Regulation
     No. 4.
4.   . . . [Plaintiff's] allegations regarding his
     limitations are not wholly credible for the
     reasons set forth in the body of the decision.
5.   [Plaintiff] has the following residual capacity:
     Stand/walk for 6 hours in an 8-hour workday, sit
     for 6 hours in an 8-hour day, and lift 50 pounds
     occasionally and 25 pounds frequently.   The
     claimant is restricted to no climbing of
     ladders/ropes/scaffolds, must avoid concentrated
     exposure to hazards such as machinery and heights
     and is limited to occasional handling with the
     non-dominant left hand.
6.   [Plaintiff] is unable to perform any of his past
     relevant work (20 CFR § 416.965).
7.   [Plaintiff] was "closely approaching advanced age"
     as of his alleged disability onset date.
     [Plaintiff] is currently an individual of
     "advanced age" (20 CFR § 416.963).

---

be paid benefits by the Commissioner of Social Security."   42
U.S.C. § 1381a.

[3]"[A]n individual shall be considered to be disabled . . .
if he is unable to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than twelve months."   42 U.S.C. § 1382c(a)(3)(A).

[4]Hereinafter known as "the Regulations."

3

8.  [Plaintiff] has a high school (or high school equivalent) education (20 CFR § 416.964).
9.  [Plaintiff] does not have any transferable skills (20 CFR § 416.968).
10. [Plaintiff] has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).
11. Although [plaintiff's] exertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rules 203.15 and 203.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a woodworking assembler (800,000 jobs nationally and 60 in the local economy); office cleaner (1 million jobs nationally and 5000 jobs in the local economy) and dining room attendant (500,000 jobs nationally and 1500 jobs in the local economy) [.]
12. [Plaintiff] was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(Id. at 19-20) On February 18, 2005, the Appeals Council denied

plaintiff's request for review of the ALJ's decision, making it

"the final decision of the Commissioner of Social Security."

(Id. at 5) Plaintiff filed suit in the United States District

Court for the District of Delaware within sixty days of receiving

the denial, as required by 20 C.F.R. § 422.210(c). (D.I. 2)

## B. Medical Evidence

Plaintiff was admitted to the hospital on June 24, 2002

after having a seizure related to alcohol withdrawal. (D.I. 10

at 141) He was discharged two days later after a CT scan and EEG

came back within normal limits; an MRI administered during the

same hospital stay showed some atrophy in plaintiff's brain, as

4

well as the absence of any lesions or cerebral hemorrhaging.
(Id.) Plaintiff testified that he has not had any alcohol since
his seizure. (Id. at 36) Plaintiff began experiencing headaches
after his seizure. (Id. at 167) An August 20, 2002 report from
the Delaware Disability Determination Service stated that, "per
treating doctor [plaintiff] should return to work, but restricted
to small job[s]." (Id. at 168)

In October 2002, plaintiff had "a temporal artery biopsy
which was negative for arteritis"; according to his doctor,
plaintiff also reported "continued cranial pressure and soreness
of the scalp on the left side." (Id. at 171) Likewise,
plaintiff reported "intermittent episodes of dizziness,
particularly after arising from sitting for a significant period
of time." (Id. at 174) After the biopsy, plaintiff had a
carotid duplex which, despite his continued headaches, showed
results within normal limits. (Id. at 175)

A December 11, 2002 report by Dr. Robert Sergott stated
that, about a week after plaintiff was hospitalized for the
seizure, "he began to have some rather constant left sided
parietal occipital pain. There has also been rather constant
ringing in his left ear." (Id. at 179) According to Dr.
Sergott, a specialist in Neuro-Opthalmology, plaintiff "ha[d]
been taking medication. Maxalt does help him during the day . .
. . [Plaintiff] also noticed that activity will help him as

5

well."  (Id.)  Dr. Sergott could not find "any primary neuro-
ophthalmic reason for [plaintiff's] loss of vision" and suspected
that "[it might] be related to some cervical spine disease" or
"thyroid disease[,] which on rare occasions can present with
headaches."  (Id. at 180)

In February 2003, Dr. Eric Tamesis reported that plaintiff
continued to have headaches and ringing in his ear and still felt
"weak and dizzy upon getting up from a seated position."  (Id. at
182)  Plaintiff reported that taking the drug Neurontin "may have
helped some."  (Id.)  Plaintiff had a Tilt Table Evaluation on
March 5, 2003; he reported that, after "sitting awhile [and] then
standing[,] he [felt] lousy" and "fatigued."  (Id. at 197)  The
initial impression of the technician administering the evaluation
was that it was an "[a]bnormal test with reproduction of the
patient's symptoms."  (Id.)  A CT scan done in March 2003
revealed that plaintiff was suffering from sinusitis.  (Id. at
205)  On April 8, 2003, plaintiff saw Dr. Jay Freid, who reported
that, in addition to headaches and sinusitis, plaintiff had
"occasional knee pain, and . . . some numbness, because he [was]
leaning on a lot [sic] on his back while working as a carpenter,
he [was] on his knees up a lot, [and] he still [got] a little bit
tired at times."  (Id. at 211)  On May 9, 2003, Dr. Cedric T.
Barnes reported to Delaware Health and Social Services that
plaintiff was unable to work at his usual occupation because of

6

"vertigo; chronic headaches; depression; [and] carpal tunnel"; the doctor estimated that said illnesses would last more than twelve months.  (Id. at 285)

On August 7, 2003, plaintiff had a "[l]eft and right endoscopic maxillary antrostomy and left and right endoscopic ethmoidectomy" in an attempt to correct "[c]hronic maxillary and ethmoid sinusitis."  (Id. at 250)  A contemporaneous medical report stated that plaintiff's "severe headache . . . improve[d] when he [was] on an antibiotic."  (Id. at 253)  Sometime around the end of August 2003, a State medical agency consultant evaluated plaintiff's records and completed a Physical Residual Functional Capacity Assessment, stating that plaintiff was physically capable of:  (1) occasionally lifting or carrying fifty pounds; (2) frequently lifting or carrying 25 pounds; (3) standing or walking for a total of about six hours of an eight hour workday; and (4) sitting for six hours in an eight hour workday.  (Id. at 257)  The consultant likewise concluded that plaintiff had carpal tunnel syndrome which somewhat limited plaintiff's use of his upper extremities.  (Id.)  The report further suggested that plaintiff refrain from:  (1) climbing on ladders, ropes, or scaffolds; (2) continuously engaging in tasks requiring "[h]andling (gross manipulation)" or "[f]ingering (fine manipulation)"; and (3) any exposure to hazards such as machinery or heights.  (Id. at 258-60)  In the evaluator's opinion,

7

plaintiff's limitations were "attributable . . . to a medically determinable impairment." (Id. at 261) A Psychiatric Review dated September 2, 2003 found that plaintiff's mild depression and alcohol withdrawal were not severe and constituted "[a] medically determinable impairment . . . that [did] not precisely satisfy the diagnostic criteria" for disabling affective disorders as promulgated in the Regulations, 20 C.F.R pt. 404, subpt. P, app. 1 §§ 12.00 et seq.. (D.I. 10 at 268)

Plaintiff had another sinusitis-related surgery on October 2, 2003. (Id. at 298) A second Psychiatric Review, completed on January 6, 2004, again concluded that plaintiff's depression was not severe and did not meet the statutory definition of a "disability." (Id. at 310, 313) Plaintiff underwent a third surgical procedure for chronic sinusitis on February 5, 2004. (Id. at 329) All the while, plaintiff continued to complain of headaches in the left temporal area of his head. (Id. at 370)

Jack Dilts, D.O., of the Delaware Disability Service, examined plaintiff on March 2, 2004. His impressions of plaintiff's condition included chronic headaches (secondary to chronic sinusitis), chronic sinusitis with ethmoid polyp, carpal tunnel syndrome, and depressive personality. (Id. at 372) A Physical Residual Functional Capacity Assessment dated March 10, 2004 found that plaintiff still could not lift or carry more than fifty pounds on an occasional basis nor more than twenty-five

8

pounds on a frequent basis. It likewise concluded that plaintiff had an unlimited ability to push or pull and could stand, walk, or sit for six hours in an eight hour workday. The report again found that plaintiff should not climb on ropes, ladders, or scaffolding; should avoid hazards like machinery; and was limited in his ability to engage in the gross manipulation of objects. (Id. at 374-81)

On March 29, 2004, Dr. Nicholas J. Berg opined that, due in part to plaintiff's repeated sinus problems,

from June, 2002 until the present, [plaintiff's] conditions were such that they prevented him from doing any kind of work on a normal everyday basis. The pain that he was suffering . . . would have . . . prevented him from concentrating sufficiently to work any kind of job. Furthermore, because of the imbalance that was being caused by his condition, he could not do any kind of work involving physical activity[] while standing[.]

(Id. at 384) Dr. Berg expressed the same opinion in October of that year, adding that plaintiff "also suffers from arthritis and carpal tunnel syndrome," which "would make it even more difficult for [plaintiff] to do any kind of competitive work." (Id. at 410)

## C. Facts Evinced at the Hearing

Plaintiff was 53 years old at the onset of his alleged disability and 56 at the time of the Hearing; he is now 58 years old. (D.I. 10 at 82) Plaintiff is a high school graduate but has never had any formal job training. (Id. at 29-30) He stands 5'8" tall and, at the time of the Hearing on October 20, 2004,

9

weighed 200 pounds. (Id. at 29) Plaintiff worked as carpenter until June 2002, when he suffered an alcohol-related seizure; he has not "done any work for pay" since that time because of, inter alia, chronic sinus problems. (Id. at 31)

Plaintiff testified that, despite multiple surgeries and the use of antibiotics and Darvocet, he continues to have constant, "terrible pain" in his left temple. (Id. at 32-33) Likewise, plaintiff stated that his condition made him "tired, [and] fatigued all the time" and "affect[ed] his brain function." (Id. at 33) Plaintiff, who is right-handed, also reported having carpal tunnel syndrome in his left wrist. (Id. at 33-34) According to plaintiff, his fatigue was so bad that he had to lie down several times during the day. (Id. at 37) Despite this, plaintiff estimated that he could lift about twenty pounds and affirmed that he was still able to bend forward at the waist, kneel, crouch, squat, and stoop over and pick something up off the floor. (Id. at 38) Plaintiff stated that, while he did chores around the house and ran errands (such as cooking, cleaning, and grocery shopping), he did not engage in yard work and allowed his son to take care of his finances. (Id. at 39-40) Lastly, plaintiff testified that his extreme fatigue rendered him physically and mentally unable to do any kind of job for forty hours a week. (Id. at 43)

10

## D. **Vocational Evidence**

A vocational expert named Beth Kelley testified at the Hearing and affirmed that she had "enough information to form an opinion as to [the] exertional and skill level[s] of [plaintiff's] past relevant work[.]" (D.I. 10 at 44)  Kelley stated that plaintiff's past employment as a carpenter was "skilled work" and required a medium level of exertion.  (Id.) The ALJ then asked Kelley

> to consider a hypothetical individual who is approximately [plaintiff's] stated age at onset, of 53 years.  This individual has a high school education, [and] the work history you've just cited.  There are certain underlying impairments, and these impairments limit the individual to working at a medium level of exertion.  This individual has posturally, he should never climb a ladder, a rope, or a scaffold.  [He] [s]hould avoid concentrated exposure to hazards, and would have limited handling ability with the left hand. The person is right-hand dominant.  Would there be any – could this person do the [plaintiff's] past relevant work in your opinion?

(Id.)  Kelley indicated that, with those restrictions, plaintiff would not be able to engage in his past relevant work.  (Id. at 45)

Despite the above finding, Kelley opined that "there would be a wide range of unskilled work, and there would be a range of semi-skilled work using some of [plaintiff's] skills, in terms of woodworking assemblers, and repairers.  And in the region there would be approximately 60 of these occupations at light and medium [exertion levels]."  Kelley estimated that there were

11

approximately 800,000 such jobs on the national level.  Moreover,
Kelley stated that plaintiff would be able to perform "unskilled
work" at a medium level of exertion.  (Id.)  In Kelley's opinion,
there were 5,000 of these jobs available locally and "over a
million nationally."  (Id. at 45-46)  When questioned by
plaintiff's attorney, however, Kelley acknowledged that, if
plaintiff's testimony were deemed credible, there would be no
work available for him because his fatigue "would preclude
appropriate attendance at any [full-time] competitive
employment."  (Id. at 46)

## III.  STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if
they are supported by substantial evidence.  Accordingly,
judicial review of the Commissioner's decision is limited to
determining whether "substantial evidence" supports the decision.
See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir.
1986).  In making this determination, a reviewing court may not
undertake a de novo review of the Commissioner's decision and may
not re-weigh the evidence of record.  See id.  In other words,
even if the reviewing court would have decided the case
differently, the Commissioner's decision must be affirmed if it
is supported by substantial evidence.  See id. at 1190-91.

The term "substantial evidence" is defined as less than a
preponderance of the evidence, but more than a mere scintilla of

12

evidence.  As the United States Supreme Court has noted,

substantial evidence "does not mean a large or significant amount

of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  Pierce

v. Underwood, 487 U.S. 552, 555 (1988).  The Supreme Court also

has embraced this standard as the appropriate standard for

determining the availability of summary judgment pursuant to Fed.

R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of
> determining whether there is the need for a
> trial-whether, in other words, there are any genuine
> factual issues that properly can be resolved only by a
> finder of fact because they may reasonably be resolved
> in favor of either party.
>       Petitioners suggest, and we agree, that this
> standard mirrors the standard for a directed verdict
> under Federal Rule of Civil Procedure 50(a), which is
> that the trial judge must direct a verdict if, under
> the governing law, there can be but one reasonable
> conclusion as to the verdict.  If reasonable minds
> could differ as to the import of the evidence, however,
> a verdict should not be directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)

(internal citations omitted).  Thus, in the context of judicial

review under § 405(g),

> [a] single piece of evidence will not satisfy the
> substantiality test if the [Commissioner] ignores, or
> fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is
> overwhelmed by other evidence-particularly certain
> types of evidence (e.g., that offered by treating
> physicians)-or if it really constitutes not evidence
> but mere conclusion.

13

Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting

Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for

example, the countervailing evidence consists primarily of the

claimant's subjective complaints of disabling pain, the

Commissioner "must consider the subjective pain and specify his

reasons for rejecting these claims and support his conclusion

with medical evidence in the record."  Matullo v. Bowen, 926 F.2d

240, 245 (3d Cir. 1990).

## IV.  DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C.

§ 423(a)(1)(D), as amended, "provides for the payment of

insurance benefits to persons who have contributed to the program

and who suffer from a physical or mental disability."  Bowen v.

Yuckert, 482 U.S. 137, 140 (1987).  A disability is defined as

the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

In Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999), the Third

Circuit outlined the applicable statutory and regulatory process

for determining whether a disability exists:

> In order to establish a disability under the
> Social Security Act, a claimant must demonstrate there

14

is some "medically determinable basis for an impairment
that prevents him from engaging in any 'substantial
gainful activity' for a statutory twelve-month period."
A claimant is considered unable to engage in any
substantial activity "only if his physical or mental
impairment or impairments are of such severity that he
is not only unable to do his previous work but cannot,
considering his age, education, and work experience,
engage in any other kind of substantial gainful work
which exists in the national economy."

     The Social Security Administration has promulgated
regulations incorporating a sequential evaluation
process for determining whether a claimant is under a
disability.  In step one, the Commissioner must
determine whether the claimant is currently engaging in
substantial gainful activity.  If the claimant is found
to be engaged in substantial activity, the disability
claim will be denied.  In step two, the Commissioner
must determine whether the claimant is suffering from a
severe impairment.  If the claimant fails to show that
her impairments are "severe", she is ineligible for
disability benefits.

     In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  If a claimant does not suffer from a
listed impairment or its equivalent, the analysis
proceeds to steps four and five.  Step four requires
the ALJ to consider whether the claimant retains the
residual functional capacity to perform her past
relevant work.  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.

     If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  The ALJ must show there
are other jobs existing in significant numbers in the
national economy which the claimant can perform,
consistent with her medical impairments, age,
education, past work experience, and residual
functional capacity.  The ALJ must analyze the
cumulative effect of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.  The ALJ will often seek the
assistance of a vocational expert at this fifth step.

                            15

Id. at 427-28 (internal citations omitted).  If the ALJ finds

that a claimant is disabled or not disabled at any point in the

sequence, review does not proceed to the next step.  See 20

C.F.R. § 404.1520(a).

## B.  Whether the ALJ's Decision is Supported by Substantial Evidence

### 1.  Application of the Five-Step Test

In the case at bar, the ALJ determined that:  plaintiff has

not engaged in substantial gainful activity since his alleged

disablement; his medical condition qualifies as "severe"; his

claimed ailments are not on the list of impairments which are

presumptively disabling; and he is unable to engage in his past

relevant work.  (D.I. 10 at 19)  Thus, plaintiff is not

disqualified from receiving SSI under steps one through four of

the five-step test.  Plaintiff's complaint, therefore,

essentially challenges the ALJ's finding with respect to step

five, that there are other jobs with significant numbers in the

national economy which plaintiff can still perform.  (Id.)

Plaintiff avers that the ALJ erred in finding that plaintiff's

disability claims were not wholly credible; giving too much

credence to State agency medical consultants and the testimony of

the vocational specialist; and not giving enough weight to the

opinion of Dr. Berg, one of plaintiff's treating physicians.

(D.I. 13 at 26, 23, 30, 14)  Plaintiff likewise maintains that

16

the ALJ's finding that he was capable of performing "medium work"

was faulty.   (Id. at 25)

## 2.  Plaintiff's Credibility

The ALJ found that plaintiff's claims were not wholly

credible

> to the extent that he has described limitations which
> exceed what is shown or can reasonably be expected from
> the overall medical evidence of record as summarized in
> the text of this decision, as well as his self-reported
> activities of daily living.  These activities include
> [plaintiff], who lives with his son, shopping for
> groceries, doing laundry, cleaning, driving for simple
> errands in his car, visiting his mother in a nursing
> home, and cooking daily, according to his testimony.
> Additionally, the claimant drove himself to the
> [H]earing . . . .

(D.I. 10 at 15)   In her report, the ALJ referenced comments made

by plaintiff to Dr. Joel Rutenberg and Dr. Jay Freid, both of

whom evaluated him at various stages during his course of

treatment.   According to the ALJ, plaintiff's statements that,

for example, "his prescribed medications 'help[ed] quite a bit'"

and "he had a 50% overall improvement in his head pain following

his sinus surgery," contradicted both plaintiff's and Dr. Berg's

contentions that plaintiff was continually disabled by the pain

in his head.   (D.I. 10 at 16)   In addition, the ALJ made note of

several of plaintiff's statements, as reflected in the medical

reports of Dr. Rutenberg and Dr. Freid, that he was "trying to

work a few hours and was thinking of a career change, possibly

into real estate," or that he "was doing some home improvement

17

work with a relative."   (Id. at 17)   The ALJ contended that these
"numerous references throughout the record regarding possible
work activity" discredited the notion that plaintiff was somehow
unable to work in any capacity.   (Id.)

Plaintiff maintains that the energy required to perform the
activities listed by the ALJ is very different from that required
by a forty-hour work week, and that three different doctors have
stated that he is not able to work because of the pain in his
head and various other ailments. (D.I. 13 at 27)   While he
admits that he can perform the daily activities identified by the
ALJ, plaintiff asserts that "none of them are sustained," and the
fact that he can perform small household tasks "does not mean
that he can sustain regular activity."   (Id. at 28)

When an ALJ is confronted with subjective complaints of
pain, the United States Court of Appeals for the Third Circuit
requires:

> (1) that subjective complaints of pain be seriously
> considered, even where not fully confirmed by objective
> medical evidence; (2) that subjective pain may support
> a claim for disability benefits and may be disabling;
> (3) that where such complaints are supported by medical
> evidence, they should be given great weight; and (4)
> that where a claimant's testimony as to pain is
> reasonably supported by medical evidence, the ALJ may
> not discount claimant's pain without contrary medical
> evidence.

Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (citations
and quotations omitted).   Although "[a]n ALJ must give serious
consideration to claimant's subjective complaints of pain," Mason

18

v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), subjective
complaints of pain "do not in themselves **constitute** disability,"
Green, 749 F.2d at 1070 (emphasis in original). Subjective
complaints of pain are given "great weight" unless there is
conflicting medical evidence. See Mason, 994 F.2d at 1067-68.
When a claimant's subjective complaints of pain indicate a
greater severity of impairment than the objective medical
evidence supports, the ALJ can give weight to factors such as
physician's reports and claimant's daily activities. See 20
C.F.R. § 404.1529(c)(3) (1995).

### 3. Weight Given to Various Professionals by the ALJ

"A cardinal principle guiding disability eligibility
determinations is that the ALJ accord treating physicians'
reports great weight." Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000). "Where a treating source's opinion on the nature and
severity of a claimant's impairment is 'well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial
evidence in [the claimant's] case record,' it will be given
'controlling weight.'" Fargnoli v. Massanari, 247 F.3d 34, 43
(3d Cir. 2001). "Where . . . the opinion of a treating physician
conflicts with that of a non-treating, non-examining physician,
the ALJ may choose whom to credit but 'cannot reject evidence for
no reason or for the wrong reason.'" Morales, 225 F.3d at 317

19

(citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).
"The ALJ must consider the medical findings that support a
treating physician's opinion that the claimant is disabled." Id.
If the ALJ chooses to reject the treating physician's assessment,
the ALJ may not make "speculative inferences from medical
reports" and may reject "a treating physician's opinion outright
only on the basis of contradictory medical evidence." Plummer,
186 F.3d at 429.

### a. Plaintiff's Treating Physicians

In her written decision, the ALJ found "that Dr. Berg's
opinion [was] not supported by the totality of the medical
evidence, including his own detailed treatment records, and [was]
inconsistent with [plaintiff's] rather extensive activities of
daily living." (D.I. 10 at 15) In support of this finding, the
ALJ cited, inter alia: (1) various instances wherein plaintiff
told his treating physicians that certain medications and each of
his sinus-related surgeries had relieved some of the pain in his
head; (2) lack of evidence that plaintiff had "weakness in the
upper or lower extremities"; (3) plaintiff's "extensive
activities of daily living"; and (4) the fact that "[n]o clinical
signs or symptoms of fatigue or cognitive defects as a result of
decreased concentration have been reported by any treating or
examining physician." (Id. at 15-16) "Consequently," the ALJ
decided, "Dr. Berg's opinion [was] not supported by the

20

substantial evidence of record, [and was] not accorded any significant weight." Moreover, she opined, "the question of disability is reserved to [defendant]," the Commissioner of the Social Security Administration. (Id. at 16)

In addressing plaintiff's claim that carpal tunnel syndrome contributed to his inability to work, the ALJ referenced reports from Dr. Paul J. Harriott, another of plaintiff's examining physicians. (Id.) According to the ALJ, when plaintiff was seen by Dr. Harriott on April 27, 2004, he "reported only occasional tingling in the small and ring fingers of [his] left hand. Dr. Harriott reported that [plaintiff] had full sensation in his left hand . . . and good grip strength." (Id.) "As of his last recorded visit with Dr. Harriott on August 10, 2004, [plaintiff] was reporting only intermittent numbness in his left hand. . . . No carpal tunnel surgery has been scheduled or performed." (Id.) This, along with the fact that plaintiff is right-handed and wears a wrist brace at night, led the ALJ to conclude that plaintiff's "moderate left carpal tunnel syndrome, although improved with treatment and not requiring any surgery, may impose some limitations in more than occasional handling with the left, non-dominant hand." (Id. at 17)

## b. State agency medical consultants

State agency medical consultants prepared two different evaluations of plaintiff's condition, the first on August 27,

2003, and the second dated March 10, 2004.  (D.I. 10 at 256, 374)
Both consultants concluded that plaintiff was able, with some
limitations, to perform work at a medium level of exertion.
(Id.)   The ALJ "accept[ed] as persuasive the opinions of the
State agency medical consultants . . . , as their opinions are
well supported by the record as a whole, including detailed
treatment notes and objective studies . . . , as well as
[plaintiff's] self-reported activities of daily living, which are
not inconsistent with the ability to perform medium level work."[5]
(Id. at 17)

### c.  Beth Kelley (vocational expert)

Beth Kelley's finding that the local and national economies
offered a "wide range" of unskilled jobs suited to someone with
plaintiff's exertional limitations was derived from her analysis
of a hypothetical posed to her by the ALJ.  (D.I. 10 at 44-45)
The ALJ, giving much credence to Kelley's testimony, decided that
plaintiff was "not disabled" under the relevant guidelines
because, "considering [plaintiff's] age, educational background,
work experience, and residual functional capacity, he is capable

---

[5]The court notes, however, that the consultants' "reasoned
judgment[s]" were based solely on evidence contained in
plaintiff's file, such as "clinical and laboratory findings;
symptoms; observations; lay evidence; [and] reports of daily
activities" (D.I. 10 at 256, 374), rather than on personal
physical examinations of plaintiff himself.

of making a successful adjustment to work that exists in
significant numbers in the national economy."  (Id. at 18)

     According to the Third Circuit, "[a] hypothetical question
must reflect all of a claimant's impairments that are supported
by the record; otherwise the question is deficient and the
expert's answer to it cannot be considered substantial evidence."
Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  The
appellant in Chrupcala "argue[d] that the vocational expert's
opinion [that he was able to perform certain jobs] was deficient
because it failed to take account of all of appellant's
impairments."  The court agreed, finding that "[t]he hypothetical
question that the ALJ posed did not reflect the fact of constant
and severe pain which appellant testified to and which . . . was
supported by objective medical findings in the record."  Id.  In
2005, the Third Circuit clarified that the Chrupcala line of
cases

     do[es] not require an ALJ to submit to the vocational
     expert every impairment **alleged** by a claimant.
     Instead[,] . . . the hypotheticals posed must
     "accurately portray" the claimant's impairments and . .
     . the expert must be given an opportunity to evaluate
     those impairments "as contained in the record." . . .
     Fairly understood, such references to **all** impairments
     encompass only those that are medically established . .
     . . And that in turn means that the ALJ must accurately
     convey to the vocational expert all of a claimant's
     **credibly established limitations**.

23

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original) (internal citations and footnotes omitted).

In Snow v. Apfel, No. Civ. A. 99-602-RRM, 2000 WL 33340965 (D. Del. 2000), the court upheld as proper an exchange in which the ALJ "subjected [the vocational expert] to a three-part line of questions that progressively worked toward evaluating all the limitations that [the claimant] claimed. The first two questions were hypothetical to the extent that they did not incorporate every deficiency alleged by [the claimant]. The third question reflected every mental and physical impairment that [the claimant] claimed during her testimony." Id. at *6. According to the court, the ALJ's "three-part line of questions served to provide intermediate opinions to span the range of [the claimant's] alleged deficiencies and to test the basis of [the expert's] conclusions."

Although the crux of plaintiff's disability claim is that he suffers from severe and near-constant pain in his head (to which he attributes other ailments such as extreme fatigue), the ALJ's hypothetical question made reference only to the functional limitations identified by the State agency medical consultants and "certain underlying impairments" that "limit[ed] [plaintiff] to working at a medium level of exertion." At no point in her hypothetical question to Kelley did the ALJ mention that

24

plaintiff had been complaining of disabling headaches and fatigue for years.

### 4.  Plaintiff's Ability to Perform Medium Work[6]

Lastly, plaintiff contends that the ALJ erred when she concluded that plaintiff could perform work at a medium level of exertion.  (D.I. 13 at 25)  Specifically, he argues that his "significant non-exertional impairments" (i.e., his headaches and fatigue) made it improper for the ALJ to rely exclusively on the Medical-Vocational guidelines ("grids") set forth in the Regulations.  (Id.)

The Third Circuit has stated that the Commissioner of Social Security cannot meet her burden of showing that a claimant can still perform jobs in the local and national economies "by relying exclusively on the grids when the claimant has both exertional and nonexertional impairments."[7]  Sykes v. Apfel, 228

---

[6]Under the Regulations, "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, . . . he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).

[7]In her decision, the ALJ stated that the grids "are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations."  (D.I. 10 at 18)  In determining that plaintiff was "capable of performing a significant range of medium work" (id.), the ALJ took into account the fact that plaintiff "is restricted to no climbing of ladders/ropes/scaffolds, must avoid concentrated exposure to hazards such as machinery and heights and is limited to occasional handling with the non-dominant left hand" (id. at 15).  The ALJ did not include plaintiff's claims of pain and fatigue in

25

F.3d 259, 266 (3d Cir. 2000) (citing <u>Burnham v. Schweiker</u>, 682

F.2d 456, 458 (3d Cir. 1982)).  The Third Circuit later

recognized, however, that

> [a]fter the <u>Sykes</u> opinion, the [Social Security
> Administration ("the Agency")] issued an Acquiescence
> Ruling to specifically address how the Agency would
> deal with issues of this kind in cases within the
> geographic limits of the Third Circuit.  There, the
> Agency noted that, thereafter, at Step 5 [of the test],
> the Agency would not use the grid framework exclusively
> when there were nonexertional limitations, but would,
> in addition:
>
>> (1) Take or produce vocational evidence, such
>> as from a vocational expert, the DOT, or
>> other similar evidence (such as a learned
>> treatise); or
>>
>> (2) Provide notice that we intend to take or
>> are taking administrative notice of the fact
>> that the particular nonexertional
>> limitation(s) does not significantly erode
>> the occupational base, and allow the claimant
>> the opportunity to respond before we deny the
>> claim.

<u>Allen v. Barnhart</u>, 417 F.3d 396, 404 (3d Cir. 2005) (quoting

<u>Sykes v. Apfel; Using the Grid Rules as a Framework for</u>

<u>Decisionmaking When an Individual's Occupational Base is Eroded</u>

<u>by a Nonexertional Limitation-Titles II and XVI of the Social</u>

<u>Security Act</u>, AR 01-1(3), 2001 WL 65745, at *4 (S.S.A. Jan. 25,

2001)).

The court finds that plaintiff's subjective complaints of

pain and fatigue are credibly established nonexertional

---

this list of nonexertional limitations because, in her opinion,
they were not wholly credible.  (<u>Id.</u>)

limitations; therefore, under Sykes and the Agency's Acquiescence
Ruling, the ALJ was required to rely on more than just the grids
themselves in making her determination that plaintiff was capable
of performing medium work despite his headaches and fatigue.  The
ALJ looked outside of the grids by employing a vocational expert;
however, her hypothetical question made no mention of plaintiff's
claims of disabling pain and fatigue.  Because the ALJ failed to
elicit the vocational expert's opinion on the potential effects
of said nonexertional limitations, her hypothetical question was
"deficient."  As a result, the expert's finding that there were
jobs in the local and national economies that plaintiff was
capable of performing "cannot be considered substantial
evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.
1987).

## 5.  Analysis

The ALJ ultimately concluded that, irrespective of the
opinion of plaintiff's treating physician, Dr. Berg, plaintiff
was not disabled because of his self-reported daily activities,
statements he made to his doctors, and the evaluations completed
by the State medical consultants.  If an ALJ chooses to reject a
treating physician's assessment, she may not make "speculative
inferences from medical reports" and may reject "[the] treating
physician's opinion outright only on the basis of contradictory
medical evidence."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.

27

1999)). Other than the conclusions of State consultants who did not personally examine plaintiff, the conflicting medical evidence upon which the ALJ's determination was based is apparent neither from the record nor from the ALJ's explanation of her findings. Instead, plaintiff's testimony and medical records indicate that, while he does occasionally experience some relief from his ailments, such relief is only temporary (as shown by the fact that plaintiff was forced to undergo surgical procedures for chronic sinusitis three times in a six-month period). Dr. Berg's opinion that plaintiff's ailments make him unable to work is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record'"; therefore, the court will give it "'controlling weight.'" Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001).

The court finds that the ALJ in the case at bar failed to give proper weight to plaintiff's lengthy and well-documented complaints of subjective pain and fatigue and did not include all of plaintiff's credibly established nonexertional limitations in her hypothetical question to the vocational expert. The vocational expert herself admitted that, if plaintiff's testimony were deemed credible, he would be unable to work "because he indicated he was lying down a couple of times a day, because of the terrible fatigue. And that would preclude appropriate

attendance at any competitive employment."   (D.I. 10 at 46)
Consequently, the ALJ's (and, by accepting the ALJ's findings,
defendant's) determination that plaintiff was not disabled under
the final step of the five-part test was not supported by
substantial evidence.

## V.   CONCLUSION

Because defendant has failed to meet her burden of proof
with respect to the final prong of the five-step test for
determining the existence of a disability under the Social
Security Act, plaintiff's motion for summary judgment (D.I. 12)
is granted and defendant's motion for summary judgment (D.I. 15)
is denied.   An appropriate order shall issue.

29